

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-22-00058-CR

---

CHARLES WADE BRIGGS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR-20-27896

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

On the night of July 21, 2017, at least three men forced their way into the home of Gina and Johnnie Jones, and while one of the men subdued Gina, the other men subdued Johnnie and shot him at close range in the back of his head. Johnnie survived the attempt to murder him. A Fannin County jury convicted Charles Wade Briggs of attempted[1] murder,[2] burglary of a habitation with intent to commit aggravated assault,[3] and engaging in organized criminal activity.[4] In this appeal,[5] Briggs challenges his conviction for engaging in organized criminal activity. He contends (1) that there was insufficient evidence to support the jury's verdict that he engaged in organized criminal activity, (2) that the trial court erred when it failed to give an accomplice-witness instruction, and (3) that the evidence does not corroborate the testimony of the accomplice witness. Because we agree that the evidence was insufficient to support Briggs's conviction, we reverse the trial court's judgment and render a judgment of acquittal for the charge of engaging in organized criminal activity.

---

[1]*See* TEX. PENAL CODE ANN. § 15.01.

[2]*See* TEX. PENAL CODE ANN. § 19.02(b)(1). Briggs was sentenced to twenty years' imprisonment for attempted murder.

[3]*See* TEX. PENAL CODE ANN. § 30.02(a)(1), (d)(2). Briggs was sentenced to ten years' imprisonment for burglary of a habitation with intent to commit aggravated assault.

[4]*See* TEX. PENAL CODE ANN. § 71.02(a) (Supp.). Briggs was sentenced to forty-five years' imprisonment for engaging in organized criminal activity.

[5]In his appeal in our cause number 06-22-00056-CR, Briggs appeals his conviction for attempted murder, and in his appeal in our cause number 06-22-00057-CR, Briggs appeals his conviction for burglary of a habitation with intent to commit aggravated assault.

## I.       The Evidence at Trial

The evidence at trial showed that sometime after 10:00 on the night of July 21, 2017, Gina Jones was in her kitchen when she was knocked unconscious by an unknown intruder. When she woke up, she was laying on the floor on her back, with a man she knew as Josh on top of her holding her down with his right hand on her throat. Gina heard another man go to her door and tell a third man to come in. Those two men, one of whom had a gun in his hand, went to the back of the Joneses' house. Although Gina could not identify the two other men, she described the one with the gun as taller with dark hair and the other as shorter with curly hair. A short time later, Gina heard the gun discharge. The two men came running by, told Josh that he was supposed to keep her knocked out, and told him to get her cell phone. When the men were gone, Gina called 9-1-1 and reported that her husband had been shot by a group of men. Gina testified that, sometime before the shooting, Johnnie received a telephone call from a person who said he was Josh's dad.

Ralph Belen, a Fannin County deputy, was dispatched to the home at 10:40 p.m. and was met at the door by Gina. She led him to the living room where Johnnie lay on his back. Belen testified that Johnnie was shot in the back of the head, moaned, and was in and out of consciousness.[6]

Texas Ranger Brad Oliver conducted the initial investigation. He testified that he did not recover a shell casing but that the evidence showed that a hollow-point bullet was used. He testified that he did not recover the firearm used and did not determine the type of firearm or

---

[6]At the time of trial, Johnnie lived in an institution and was unable to walk or care for himself.

caliber used but that, based on the injuries Johnnie sustained and the blood spatter evidence, he thought the firearm was a handgun.

Oliver recovered Johnnie's cell phone and found several text messages, the last of which was received at 7:25 p.m. on July 21 from a person identified as "Josh." After Oliver determined that the telephone number for "Josh" belonged to Joshua Wade Briggs, Briggs's son, Gina positively identified Josh from a photograph array as the person who held her down. On July 23, Oliver went to Josh's house to take a recorded statement.

In his statement, Josh claimed he lost his cell phone three days earlier but gave Oliver the same telephone number as the one associated with "Josh" in Johnnie's cell phone. Josh said that he knew Johnnie as "Chip" and that Johnnie supplied him with methamphetamine and marihuana. He claimed that he had not gone anywhere on July 21 and that the last time he went to Johnnie's house was on either July 19 or 20. Josh maintained that Gina lied if she said that he was at Johnnie's house. Josh provided information to Oliver that he was familiar with Johnnie's house and that he knew how to enter through the back door. Oliver found that significant because Gina told him that the men invaded their home through the back door.

Oliver took Briggs's recorded statement that day. Briggs said that he got a telephone call at work on July 21 and was told that Josh left on his motorcycle. Briggs tried to call Josh even though he said Josh had lost his cell phone. He maintained that he left work a little after 8:00 p.m. and that Josh was home when he arrived about forty-five minutes later. Briggs said he would not let Josh leave after that and that he went to bed around one or two the next morning.

He denied that he knew where Josh got his methamphetamine and gave Oliver his cell phone number.[7]

After taking those statements, Oliver obtained two photographic arrays—one that contained the photograph of Briggs and one that contained the photograph of Briggs's brother, Dallas Shane Briggs (Shane). Oliver explained that he obtained one for Shane because Shane was the president of the local chapter of an outlaw motorcycle gang called the "Kinfolk." Gina, however, was not able to identify either Briggs or Shane as the other men who invaded her home. Oliver acknowledged that neither Briggs nor Josh was associated with the "Kinfolk" gang.

When asked on cross-examination if he had any evidence that Briggs was at Johnnie's house on the night of July 21, Oliver maintained that Josh confessed that his father was at Johnnie's house during Josh's trial six months earlier. Oliver pointed out several excerpts in the transcript of Josh's testimony from that trial placing Briggs at Johnnie's house that night:

> A.     [By Oliver] . . . [T]he answer, it says, We –Shane and I went to the front door. I don't know where the other car went – where the other car, where they were. They – they came in the house, and I don't know where they parked at or anything like that.
>
> So he's talking about his dad was in another vehicle. There was – two vehicles left their house, and he's talking about that car. And I believe there's one other place here. Just give me a second. I'll find it.
>
> . . . .
>
> A.     . . . . Line 8, question was asked by the State, "Okay. Where was your dad during all of this?"

[7]Oliver also interviewed Sapphire Owens, Josh's then-girlfriend, and Elizabeth Briggs, Briggs's wife, who gave information consistent with that given by Josh and Briggs.

Joshua Briggs: "I don't remember. It all happened so fast. I don't remember him even being in the house."

"Okay. Your dad did go with you to the residence; is that correct?"

"He was in a different vehicle."

"But he did go to the location?"

["]We – Shane and I went to the front. I don't know where the other car went – where the other car, where they were. They came in the house.["]

Let me look here and see. I thought there was one other place, sir. Here we go. On Page 32, sir, question number – Line 23. It says, "Okay" – that was a question asked by the State. "Okay. You indicate your father was in another vehicle, but he – but he was at the" – "he was at the residence?" Question.

"I never seen him come in the house. I never seen him at the residence, but he got in the car that Mac was in."

The cell phone records of Josh, Briggs, and Gina from July 18, 2017, through July 27, 2017, were introduced into evidence. Elizabeth Buhay, an analyst with the telecommunication research analysis unit of the Texas Department of Public Safety, testified that those records showed that, on July 20 at 11:03 p.m., Briggs made a call on his cell phone to the telephone owned by Gina and that the call lasted one minute and five seconds. Buhay testified that the records showed that Briggs's cell phone exchanged calls with Josh's cell phone eight times between 5:45 p.m. and 7:59 p.m. on July 21 and that it exchanged calls with Shane's cell phone four times between 8:01 p.m. and 8:21 p.m. on July 21. In addition, Buhay testified that there was no contact between Briggs's cell phone and Shane's cell phone after July 21. Buhay testified that the records showed that Josh made a cell phone call to Gina's cell phone at 10:14 p.m. on July 21.

David Thompson, the commander of the criminal investigation division of the Fannin County Sheriff's Office (FCSO), subsequently took over the investigation. He testified that, although they suspected Josh, Briggs, and Shane were involved in the shooting based on Gina's and Johnnie's statements, the consistency of the phone records with their statements, and the inconsistencies between Josh's and Briggs's statements and the phone records, there was not enough evidence to make an arrest. This changed on August 17, 2020, when Sapphire Briggs, Josh's wife at the time, came to the FCSO to make a complaint on an unrelated matter. Thompson testified that, when he interviewed Sapphire that day, she provided information about the shooting that was not known to the public and that only people involved would know. Thompson also testified that her statement was consistent with those of Gina and Johnnie and was consistent with the phone records.[8]

Based on that new evidence, Thompson obtained arrest warrants for Josh and Briggs. After Josh was arrested, Briggs fled into the woods as deputies pulled into his driveway. With the aid of prison dogs, Briggs was located behind a house. After his arrest, Josh was interviewed and again repeatedly denied that he had any knowledge of the shooting of Johnnie.[9] Briggs was also interviewed and repeatedly denied that he had any involvement, that he knew Johnnie, that he was at Johnnie's house, and that he made the telephone calls.

---

[8]Before Sapphire came forward, Shane died in a motorcycle accident in 2019.

[9]Robert Williams, an investigator with the FCSO, also interviewed Josh because he was familiar with him from other cases. In that interview, Josh repeatedly denied that he was at Johnnie's house, that he knew Johnnie, or that he had any knowledge about the incident. Williams also interviewed Briggs, who also repeatedly denied that he was at Johnnie's house, that he knew Johnnie, or that he had any knowledge about the incident. Williams knew Josh because Josh had some theft cases and was a confidential informant in a few narcotics cases. He also testified that Briggs helped the FCSO recover a large amount of property stolen by Josh.

Thompson testified that Josh was charged with attempted murder because Johnnie was shot in the head from point-blank range, which indicated they intended to kill him. Josh was also charged with burglary with intent to commit an aggravated assault and with engaging in organized criminal activity. He opined that the organized criminal activity charge was appropriate because there was evidence that three or more people conspired to commit a crime and at least three were inside the residence when Johnnie was shot. He testified that investigators had not definitively determined who pulled the trigger but knew that Josh and two other people were in the house. Thompson testified that in October 2021, Josh admitted that he was at Johnnie's house and that he was involved, named one other person involved, and indicated that Briggs was at Johnnie's house at the time of the shooting.

On cross-examination, Thompson testified that Johnnie said that, before the shooting, he received a telephone call from someone who identified himself as Josh's father and threatened him that, if he continued to sell drugs to his son, there would be hell to pay. Thompson considered "hell to pay" to be a threat, but also agreed that it could mean that Johnnie would go to jail. Thompson testified that he did not know (1) whether Briggs had a gun on the night of July 21, 2017, (2) whether Briggs shot Johnnie, (3) whether Briggs ordered someone to shoot Johnnie, or (4) whether Briggs went inside Johnnie's house that night. He testified that Josh's confession placed Briggs at Johnnie's house, if not inside.

Thompson concluded from Sapphire's statements, and from the statements of Briggs's daughter, Logan Briggs, that Briggs was at the scene and that Briggs organized and solicited the incident. Thompson opined that the telephone records confirmed Johnnie's statement that he

received a call from Josh's father, contradicted Briggs's statement that he was at home at the time of the incident, and contradicted Josh's original statement that he had lost his cell phone before the incident.

Sapphire testified that she married Josh on April 19, 2019, and that they had been together for five or six years when they married. She was close to all of Josh's family, and she, Josh, his parents, and his grandmother all lived in homes on the same pasture in Honey Grove. Sapphire testified that Josh got involved in drugs in high school and that he had a problem with methamphetamine.

She remembered that, on the night of July 21, 2017, Josh was "freaked out" about Johnnie, who was his drug dealer. Josh was scared about something to do with Johnnie and drugs. Josh told his father, who then called Johnnie and afterward called Shane. Shane then came to Briggs's house with three or four members of his biker gang.[10] After they arrived, they talked to Josh and Briggs about the situation, then they got ready outside. The women were told to stay inside.[11] Sapphire could not hear their conversation but could see them gathering their weapons, which she said consisted of guns and a wooden stick. Sapphire's understanding was that they were going to scare Johnnie so he would leave Josh alone. She described their demeanor as fairly calm and determined. Sapphire testified that, once it started getting dark, Josh, Briggs, Shane, and the people Shane brought with him left the house. She remembered that Josh and Briggs were in a truck and that the rest were on motorcycles.

---

[10]Sapphire testified that Shane's biker gang was a violent gang and that everybody in the family knew it.

[11]Sapphire testified that she, Briggs's wife (Liz), his mother (Mary), Josh, and Sapphire's child (Kaydence) were in the house.

After a while, the men returned. Sapphire testified that Josh was freaking out, laid on top of her in a chair, and tried to tell her what happened but could not because he was crying. Then Briggs and Shane came in, and Shane explained to them what happened and told them they could not tell anybody about it. He said that his group did not play around and that, if anybody said anything, they would come for them, their family, and everyone they cared about, including their mom, sister, brother, and children. He said that they would kill everyone.

Although Shane said that, Sapphire testified, Briggs agreed with everything he said and said that Shane was not kidding and that they had to be careful. Then Briggs said that somebody would probably come around because a telephone call was indicated on the victim's cell phone before the incident happened. They said they all needed to be on the same page on what to say when someone showed up. Briggs came up with the story that they were to tell—that they were all home all night and did not leave. Sapphire remembered that Shane had an empty shell casing that he showed them and said, "This is what happens to drug dealers that sell drugs to kids."

Sapphire testified that, later that night, Josh told her what happened. He told her (1) that he was instructed to hold the lady down in the front room, (2) that Shane and Briggs went to the back room, (3) that a couple of other people came through the back door, and (4) that Johnnie was shot in the head. A couple of days later, a Texas Ranger came by, and everyone told him what they had been instructed to say. She testified that, when the topic randomly came up in the following years, Briggs talked about how they got away with it and did not get caught. According to Sapphire, Briggs was bragging, without remorse or shame. Sapphire testified that it came up when she threatened to leave Josh, and Briggs told her that she knew a lot and made

sure that she would not say anything. However, the last time she left, Briggs told her that they knew how to kill someone and that the same thing could happen to her.

Johnnie testified that, in July 2017, he received a telephone call from a man who said he was Josh's dad and asked if he was selling drugs to his son. Although Johnnie denied selling drugs to his son, the man said that he was "going to send somebody to take care of [him]." On the night of the shooting, Gina tried to warn him because they had already jumped her, then three men rushed at him. He testified that he fought back until he got tired, then they held him down and the dad looked at him and told him, "[W]hen I called you . . . I told you I would send somebody to take care of you."[12]

Josh testified that he did not recall if he used methamphetamine on the day of the incident. He claimed that he probably went riding on his father's motorcycle and that Shane was at the house when he got back. According to Josh, Shane noticed he was high, pulled him behind a shed, and threatened to blow his head off if he did not tell Shane where he got the dope. Since Shane had a gun, Josh told him that he got it from Johnnie. While they were behind the shed, some of Shane's friends showed up, and they and Shane had a conversation in the driveway.

Josh also testified that, at some point, he and Shane left the house in a car, but he did not remember anybody else leaving. When they got to Johnnie's house, he went to the back door, knocked, and was let in by the lady. Shane then pushed him down and knocked the lady down, and when he got back up, Shane threw him on the lady and told him to hold her. Then the other

---

[12]Johnnie testified that, as a result of the shooting, he had about five percent use of his limbs, still had parts of the bullet in his brain, was not able to walk, and resided in a nursing home.

bikers ran through the back door to the other end of the house, and he heard a gunshot. He assumed Shane pulled the trigger.

Josh testified that, when they returned to Briggs's house, Shane and the bikers told everyone that they were never there, and if anybody said they were, they would come back and kill everyone, including the children. Josh maintained that Briggs was sitting with his family and was shaken up.

On direct examination, Josh maintained that he never saw Briggs at Johnnie's house and that he did not remember seeing him before he left his house. He maintained that, at his trial, he said he did not know if Briggs was there and that he never saw him. He denied that he testified that he saw Briggs get in the car with a man known as "Mac." On cross-examination, Josh agreed (1) that Briggs was at his house before he and Shane went to Johnnie's house, (1) that Briggs did not want Shane to be there, (3) that Briggs and Shane talked in the driveway where Briggs tried to get Shane to leave, and (4) that Briggs told Shane to leave multiple times. He testified that he did not see Briggs at Johnnie's house or on the property that night.

In sum, Josh testified at Briggs's trial in a manner that placed blame for the crimes at the Jones house on Shane—who was deceased—and the other bikers.

Logan Briggs testified that Briggs is her father and that, at some point, she lived with Briggs, Josh, and her sister Ashlyn. She testified that, in the summer of 2020 after he and Sapphire broke up, Josh told her that Briggs, Shane, he, and a few others went down the road to a man's house, that he had to hold the girl down, and that the others beat the guy with a gun. Josh told her that Briggs made him do it and did not say that Shane threatened him or Briggs.

**II.     The Evidence Was Insufficient to Support the Jury's Verdict**

In this appeal, Briggs challenges the sufficiency of the evidence to support his conviction for engaging in organized criminal activity.  He argues that there is no evidence that he conspired to commit the predicate crimes alleged, that he participated in those crimes, or that there was an agreement to continue to engage in criminal activity beyond the single criminal episode on the night Johnnie was shot.  We agree that there was legally insufficient evidence presented at trial to support a conclusion that Briggs intended to participate in a combination beyond the night of the shooting.

**A.     Standard of Review**

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt."  *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)).  "Our rigorous legal sufficiency review focuses on the quality of the evidence presented."  *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge."  *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex.

Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Paroline v. State*, 532 S.W.3d 491, 498 (Tex. App.—Texarkana 2017, no pet.) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13) (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Williamson*, 589 S.W.3d at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim.

App. 2014)).  "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'"  *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

### B.    Engaging in Organized Criminal Activity

"Under the Penal Code, a person engages in organized criminal activity 'if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit one or more [enumerated offenses, including theft].'"  *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002) (quoting TEX. PENAL CODE ANN. § 71.02). "The term combination means 'three or more persons who collaborate in carrying on criminal activities.'"  *Id.* (quoting TEX. PENAL CODE ANN. § 71.01(a)).  "To establish participation in a combination, the State must prove 'that the appellant intended to "establish, maintain, or participate in" a group of three or more, in which the members intend to work together in a continuing course of criminal activities.'"  *Id.* (quoting *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999)).  In other words, there must be continuity to the combination in which the defendant and at least two other persons intended and "agreed to 'work together in a continuing course of criminal activities.'"  *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999) (quoting *Nguyen v. State*, 977 S.W.2d 450, 455 (Tex. App.—Austin 1998, pet. ref'd)).

As a result, an agreement to jointly commit a single crime will not satisfy the requirement to show a combination.[13]  *Id.*  Likewise, a showing of multiple crimes in a single criminal

---

[13]This is not to say that a showing of a series of criminal acts is required to show an intent to engage in a continuing course of criminal activities.  Rather, the Texas Court of Criminal Appeals has explained that "a showing of an intent to establish a combination did not foreclose the possibility that the proscribed action may be the first actual

episode may not show the continuity needed to establish a combination. *Ross v. State*, 9 S.W.3d 878, 882 (Tex. App.—Austin 2000, pet. ref'd). Rather, "[t]here must be proof of an intent to participate in a criminal combination that extends beyond a single criminal episode, *ad hoc* effort, or goal, regardless of whether multiple laws were broken within the confines of that episode or effort." *Lashley v. State*, 401 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Arredondo v. State*, 270 S.W.3d 676, 682–83 (Tex. App.—Eastland 2008, no pet.). In *Ross*, a group of boys sought to retaliate against a girl who purportedly cut them off in traffic. *Ross*, 9 S.W.3d at 880. The boys committed a series of assaults while pursuing the girl on Interstate 35 and beat her when she was forced to come to a stop. *Id.* at 880, 882. Because there was no evidence that would lead to a reasonable inference of an agreement to continue criminal activity after their final assault on the girl, the court of appeals held that the evidence was insufficient to support a conviction for engaging in organized criminal activity. *Id.* at 882.

Under the Texas Penal Code, a person may engage in organized criminal activity either by commission, or by conspiring to commit, one or more of the enumerated offenses. *See O'Brien*, 544 S.W.3d at 392; TEX. PENAL CODE ANN. § 71.02 (Supp.). Whether the State charges the defendant with engaging by commission or engaging by conspiracy, "the State still must prove the existence of a criminal combination." *O'Brien*, 544 S.W.3d at 393 (citing *Nguyen*, 1 S.W.3d at 695–96). In other words, in both instances, the State must show an agreement between the defendant and at least two other persons to continue criminal activity.

crime committed by a member of the combination." *O'Brien v. State*, 544 S.W.3d 376, 390 (Tex. Crim. App. 2018) (citing *Nguyen*, 1 S.W.3d at 697).

**C.    Analysis**

The indictment charged Briggs with conspiring to commit burglary, aggravated assault with a deadly weapon, assault causing bodily injury, deadly conduct, theft, tampering with witnesses, obstruction or retaliation, or the unlawful transportation of a firearm. Briggs challenges the sufficiency of the evidence to support a finding that there was an agreement to continue to engage in criminal activity beyond the single criminal episode on the night Johnnie was shot. The State concedes that the offenses that occurred during the invasion of Johnnie's home could be viewed as a single criminal episode but asserts that the members of the combination unlawfully transported firearms,[14] tampered with witnesses,[15] and committed obstruction and retaliation.[16]

We agree that there is legally sufficient evidence of an agreement between Briggs, Shane, Josh, and possibly others, to exact revenge upon Johnnie for selling methamphetamine to Josh and that, in executing that plan, multiple offenses were committed in a single criminal episode. We also agree that Shane's threats to kill every member of Briggs's family should he or his fellow gang members be implicated in the attack on Johnnie is some evidence of witness tampering and obstruction or retaliation. Critically, what is lacking in the trial record is any

---

[14]*See* TEX. PENAL CODE ANN. § 46.02(a-1)(2)(A), (B) (Supp.) (requiring, among other things, that the person "carries on or about his or her person a handgun in a motor vehicle or watercraft that is owned by the person or under the person's control"). Although the firearm used in the shooting of Johnnie was not recovered, there was no evidence that it was transported by a person in a motor vehicle owned by or under the control of that person.

[15]*See* TEX. PENAL CODE ANN. § 36.05.

[16]*See* TEX. PENAL CODE ANN. § 36.06.

evidence of an agreement between Briggs, Shane, and Shane's gang members regarding that threat.

The only evidence of that threat was through Sapphire's testimony. Regarding the threat, Sapphire said,

> [Shane] told us that if we tried to tell anybody what happened, that the people that Shane ran with would kill all of us. And [Shane] said they didn't care if it was your mom, your sister, brother, kid, nothing, that it didn't matter who it was, that they would come kill everyone we cared about if we tried to tell anybody that they were affiliated with the situation.

Sapphire also testified that Briggs said Shane was not kidding, that Shane was serious, that they had to be careful, and that Briggs devised a plan for what the family members should say if questioned by law enforcement.

From the testimony regarding Briggs's actions after Shane made his threat, a reasonable jury could infer that Briggs agreed with those involved in shooting Johnnie that his, Josh's, Shane's, and the gang members' involvement in the shooting should not be revealed. However, it is unremarkable that persons involved in a serious crime would agree to keep their involvement secret. At most, that would amount to the final act of the single criminal episode that sought revenge on Johnnie.

An examination of Sapphire's testimony shows that a reasonable jury could not infer from that testimony that Briggs entered into an agreement with Shane and his gang members to threaten the lives of his family. First, Shane's threat was conditional; he and his gang would execute it only if a member of Briggs's family told somebody that Shane and his gang were involved in the shooting. He did not make a similar threat if Briggs or Josh were implicated in

the crime. Further, the threat to "kill everyone [they] cared about" necessarily included Briggs's mother, wife, children, and grandchildren, as well as Briggs himself. No reasonable jury could infer that Briggs would agree to such a threat against all those for whom he cared.

Sapphire also testified that, several times between the night of the incident and when she left Josh in August 2020, she threatened to leave Josh. When she made those threats to leave Josh, Briggs reminded her that she knew a lot and made sure that she would not say anything. When she finally left in 2020, Briggs told her, "[W]e know how to kill somebody and . . . same thing could happen to you." Notably, Sapphire did not testify that Briggs ever reminded her of the threat made by Shane or that he made any threat that involved Shane and his gang. Further, the final threat by Briggs was made at least eight months after Shane died. While this may be evidence that Briggs, individually, threatened Sapphire, it is not evidence of an agreement between Briggs, Shane, and the gang members to threaten the lives of Briggs's family.

As a result, we find that there was legally insufficient evidence of an agreement between Briggs and at least two other persons to continue criminal activity beyond the single criminal episode that sought revenge on Johnnie. Consequently, we find that there was legally insufficient evidence to support Briggs's conviction for engaging in organized criminal activity.

## III. No Lesser-Included Offense Under the Indictment

After finding that the evidence was insufficient to support a defendant's conviction, we are required to determine whether the conviction should be modified to reflect a conviction for a lesser-included offense. *See Canida v. State*, 434 S.W.3d 163, 166 (Tex. Crim. App. 2014). To do so, we

> must answer two questions: 1) in the course of convicting the appellant of the greater offense, must the jury have necessarily found every element necessary to convict the appellant for the lesser-included offense; and 2) conducting an evidentiary sufficiency analysis as though the appellant had been convicted of the lesser-included offense at trial, is there sufficient evidence to support a conviction for that offense? If the answer to either of these questions is no, the court of appeals is not authorized to reform the judgment. But if the answers to both are yes, the court is authorized—indeed required—to avoid the "unjust" result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense.

*Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014).

Because "prosecutors have broad discretion in deciding which cases to prosecute," *Lang v. State*, No. PD-1124-19, 2022 WL 3641007, at *3 (Tex. Crim. App. Aug. 24, 2022) (quoting *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004), modifying a judgment is only "proper when the 'lesser included' offense is authorized by the indictment," *Id.* (quoting *Walker v. State*, 594 S.W.3d 330, 340 (Tex. Crim. App. 2020)). *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(1) ("An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]"). In other words, "a lesser-included offense exists if proof of the alleged offense would also prove the supposed lesser-included offense." *Lang*, 2022 WL 3641007, at *3. For that reason, we must

first determine whether there is a lesser-included offense of the greater offense as charged in the indictment. *See id.*

We use the cognate-pleadings approach "[t]o determine whether a lesser-included offense exists under article 37.09(1)." *Id.* at *4 (citing *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007)). Using this approach, we "compare[] the elements of the greater, charged offense as stated in the indictment to the statutory elements of the purported lesser-included offense." *Id.* (citing *Fraser v. State*, 583 S.W.3d 564, 568 (Tex. Crim. App. 2019)). We will find that an offense is a lesser-included offense of the offense charged in the indictment "if the indictment for the greater-inclusive offense either: 1) alleges all of the elements of the lesser-included offense, or 2) alleges elements plus facts (including descriptive averments . . . ) from which all of the elements of the lesser-included offense may be deduced." *Id.* (quoting *Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009) (per curiam, op. on reh'g)).

As noted earlier, the indictment in this case charged Briggs with engaging in organized criminal activity by conspiring to commit certain predicate offenses. The predicate offenses alleged included both felonies (e.g., burglary of a habitation[17] and aggravated assault with a deadly weapon[18]) and misdemeanors (e.g., assault causing bodily injury[19] and theft of a cell phone[20]). "When the State charges a defendant with engaging by conspiracy—as with any conspiracy—jury unanimity is not required regarding the particular overt acts alleged because

---

[17]*See* TEX. PENAL CODE ANN. § 30.02(c)(2).

[18]*See* TEX. PENAL CODE ANN. § 22.02(b) (Supp.).

[19]*See* TEX. PENAL CODE ANN. § 22.01(b).

[20]*See* TEX. PENAL CODE ANN. § 31.03(e)(3)

the gravamen of the offense is the agreement." *O'Brien*, 544 S.W.3d at 392–93. Further, "[w]hen the State charges a defendant with engaging by conspiracy—as with any conspiracy—the State is not required to show a completed offense." *Id.* at 393.

Under the organized crime statute, "'[c]onspires to commit' means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement." TEX. PENAL CODE ANN. § 71.01. This definition is similar to the elements of a criminal conspiracy. *See* TEX. PENAL CODE ANN. § 15.02(a)(1), (2). However, to commit a criminal conspiracy, the State must also show that the person intended "that a felony be committed." TEX. PENAL CODE ANN. § 15.02(a). While the intent that a felony be committed might be derived from the allegations that Briggs conspired to commit the felony offenses alleged, the intent that a felony be committed cannot be derived from the allegation that Briggs conspired to commit the misdemeanor offenses alleged.

Because, under the indictment, the State could prove the offense charged by showing that Briggs conspired to commit only the predicate misdemeanor offenses, the alleged offense would not also prove criminal conspiracy. For that reason, we find that there was no lesser-included offense alleged under the indictment. Accordingly, we decline to modify the judgment to reflect a conviction of a lesser-included offense.

## IV.    Disposition

For the reasons stated, we reverse the trial court's judgment and render a judgment of acquittal for the offense of engaging in organized criminal activity.[21]


Charles van Cleef
Justice

Date Submitted:     January 27, 2023
Date Decided:       April 21, 2023

Do Not Publish

---

[21]Because Briggs's first issue entitles him to an acquittal, we need not address his other issues.